CALABRIA, Judge.
 

 *282
 
 Donald Joseph Kuhns ("defendant") appeals from a judgment entered upon a jury's verdict finding him guilty of voluntary manslaughter. After careful review, we conclude that the trial court committed prejudicial error by denying defendant's request for a jury instruction on the defense of habitation, N.C.P.I.-Crim. 308.80. Therefore, we reverse the trial court's judgment and remand for a new trial.
 

 *829
 

 I. Factual and Procedural Background
 

 In October 2014, defendant lived across the road from his son ("George") in the Johnny Walker Mobile Home Park ("JWMHP") in Hiddenite, North Carolina. Kenneth Nunnery ("Nunnery") and Johnny Dockery ("Dockery") lived in separate homes on nearby Ervin Lane. Defendant, George, Nunnery, and Dockery were friends and frequently spent time together.
 

 After defendant came home from work at 4:30 p.m. on 2 October 2014, he went over to George's home to drink beer. Nunnery joined them around 5:30 p.m., although he does not drink alcohol. Approximately an hour later, the three men were talking outside George's home when Dockery and his girlfriend ("Kim") arrived. Dockery had a jar of "moonshine" and two shot glasses with him. Dockery and Kim were already intoxicated and started arguing. After defendant told him to "leave her alone," Dockery became angry and "started saying [he] better not catch nobody with his girlfriend, he'd kill them." Kim drove away, and Dockery ran after her.
 

 The dispute between defendant and Dockery continued to escalate over the next several hours. At 8:17 p.m., Dockery called 911 to report that Kim was driving while intoxicated. When Deputy Terry Fox ("Deputy Fox") arrived, he heard loud voices coming from the JWMHP and went to investigate. Dockery was standing in the middle of the road, shouting in the direction of defendant's home. Dockery told Deputy Fox that he was arguing with defendant, but that defendant was his friend whom he sometimes called "Dad." During their conversation, defendant exited his home, walked over to George's, and reappeared with a 12-pack of beer. As he returned home, defendant warned Deputy Fox that Dockery needed to leave before "something bad" happened. Deputy Fox ordered Dockery to go home and watched him to ensure that he complied.
 

 However, at 9:15 p.m., defendant called 911 and reported that Dockery was standing in defendant's yard, "threatening [his] life" and "running his mouth. He's been drinking white liquor and ... he's a friend
 
 *283
 
 of mine, but today he's not a friend." Defendant explained that he did not want to press charges or "hurt nobody"; rather, he "just want[ed Dockery] out of [his] face." When law enforcement arrived, Dockery was "yelling pretty loud." He told the officers that "people were being rude to him" and "called him names." Defendant warned them to tell Dockery "not to come back or he would do something about it." The officers again instructed Dockery to go home, and followed him to ensure that he complied.
 

 At approximately 10:00 p.m., the argument culminated in a final confrontation in defendant's yard, which ended when defendant fatally shot Dockery. However, conflicting evidence was presented at trial to explain how these events transpired. Defendant's next-door neighbor, Angela McFee, testified that minutes before the shooting, she was sitting on her porch when she overheard defendant taunting Dockery as he walked home through a nearby field. According to McFee, defendant said, "[T]hat's right, take your f---ing a-- home," and used a racial slur. At that point, Dockery walked over to defendant's yard, and the men began "cursing and fussing." Dockery asked defendant "if he had his gun out, and [defendant] said yeah."
 

 However, according to defendant, he was inside his home, attempting to sleep, when he heard Dockery yelling, "[C]ome on out here, you son of a bitch, I'm going to kill you." Defendant retrieved his .32-caliber pistol and went outside onto the porch, approximately six and one-half feet above the yard. Dockery was in the yard just beside the porch, "cussing and hollering" at defendant. Defendant told Dockery to go home. When Dockery saw the gun, he said, "[Y]ou're going to need more than that P shooter, motherf---er, I've been shot before." According to defendant, Dockery was pacing back and forth, and then "came at [him] really fast." Defendant took a step back and fired one shot. The bullet struck Dockery just above his left eyebrow, killing him.
 

 On 3 October 2014, Alexander County Sheriff's Office deputies executed an arrest warrant charging defendant with first-degree murder. Defendant was indicted for the same offense on 27 October 2014. Trial commenced during the 3 May 2016 session of Alexander
 
 *830
 
 County Superior Court. Following the State's presentation of evidence, defendant presented evidence, including his own testimony.
 

 At the charge conference, after the trial court included self-defense within its list of proposed jury instructions, defense counsel requested that the court exclude all references to defendant as the aggressor. In addition, defense counsel requested that the trial court deliver
 
 *284
 
 N.C.P.I.-Crim. 308.80, the pattern jury instruction pertaining to the defense of habitation. After considering arguments from both parties, the trial court denied both of defendant's requests. The trial court concluded that there were "factual issues that must be resolved by the jury with respect to the aggressor issue," and that N.C.P.I.-Crim. 308.80 "did not apply because there was no evidence that [Dockery] was trying to break in." Following the jury charge, defendant renewed his objection to the trial court's denial of his requested instructions.
 

 On 13 May 2016, the jury returned a verdict finding defendant guilty of the lesser-included offense of voluntary manslaughter. The trial court sentenced defendant to 73 to 100 months in the custody of the North Carolina Division of Adult Correction. Defendant appeals.
 

 II. Defense of Habitation
 

 On appeal, defendant first argues that the trial court erred by denying his request for a jury instruction on the defense of habitation, pursuant to N.C.P.I.-Crim. 308.80. We agree.
 

 "The prime purpose of a court's charge to the jury is the clarification of issues, the elimination of extraneous matters, and a declaration and an application of the law arising on the evidence."
 
 State v. Cameron
 
 ,
 
 284 N.C. 165
 
 , 171,
 
 200 S.E.2d 186
 
 , 191 (1973),
 
 cert. denied
 
 ,
 
 418 U.S. 905
 
 ,
 
 94 S.Ct. 3195
 
 ,
 
 41 L.Ed. 2d 1153
 
 (1974). Accordingly, "[i]t is the duty of the trial court to instruct the jury on all substantial features of a case raised by the evidence."
 
 State v. Shaw
 
 ,
 
 322 N.C. 797
 
 , 803,
 
 370 S.E.2d 546
 
 , 549 (1988). In determining whether the evidence is sufficient to entitle the defendant to jury instructions on a defense, the trial court must consider the evidence in the light most favorable to the defendant.
 
 State v. Mash
 
 ,
 
 323 N.C. 339
 
 , 348,
 
 372 S.E.2d 532
 
 , 537 (1988). The "trial court must give a requested instruction that is a correct statement of the law and is supported by the evidence."
 
 State v. Wilson
 
 ,
 
 354 N.C. 493
 
 , 516,
 
 556 S.E.2d 272
 
 , 287 (2001) (citation omitted). Whether the trial court erred in instructing the jury is a question of law, reviewed
 
 de novo
 
 on appeal.
 
 State v. Bass
 
 , --- N.C. App. ----, ----,
 
 802 S.E.2d 477
 
 , 481,
 
 temp. stay allowed
 
 ,
 
 370 N.C. 75
 
 ,
 
 800 S.E.2d 421
 
 (2017).
 

 North Carolina has long recognized that "[a] man's house, however humble, is his castle, and his castle he is entitled to protect against invasion[.]"
 
 State v. Gray
 
 ,
 
 162 N.C. 608
 
 , 613,
 
 77 S.E. 833
 
 , 835 (1913). Commonly known as the "castle doctrine," the defense of habitation "is based on the theory that if a person is bound to become a fugitive from her own home, there would be no refuge for her anywhere in the world."
 
 State v. Stevenson
 
 ,
 
 81 N.C. App. 409
 
 , 412,
 
 344 S.E.2d 334
 
 , 335 (1986).
 

 *285
 
 "The principle that one does not have to retreat regardless of the nature of the assault upon him when he is in his own home and acting in defense of himself, his family and his habitation is firmly embedded in our law."
 
 State v. McCombs
 
 ,
 
 297 N.C. 151
 
 , 156,
 
 253 S.E.2d 906
 
 , 910 (1979). At common law, the use of deadly force in defense of the habitation was justified only to prevent a forcible entry under circumstances where the occupant reasonably apprehended death or great bodily harm to himself or others, or believed that the assailant intended to commit a felony.
 
 Id.
 
 at 156-57,
 
 253 S.E.2d at 910
 
 . "Once the assailant ... gained entry, however, the usual rules of self-defense replace[d] the rules governing defense of habitation," although there remained no duty to retreat.
 
 Id.
 
 at 157,
 
 253 S.E.2d at 910
 
 .
 

 The common-law rule limiting the defense of habitation to circumstances where the defendant was acting to prevent forcible entry into the home was eliminated in 1993, when our General Assembly enacted
 
 N.C. Gen. Stat. § 14-51.1
 
 .
 
 State v. Blue
 
 ,
 
 356 N.C. 79
 
 , 89,
 
 565 S.E.2d 133
 
 , 139 (2002).
 
 N.C. Gen. Stat. § 14-51.1
 
 "broadened the defense of habitation
 
 *831
 
 to make the use of deadly force justifiable whether to
 
 prevent
 
 unlawful entry into the home or to
 
 terminate
 
 an unlawful entry by an intruder."
 

 Id.
 

 In 2011, the General Assembly repealed
 
 N.C. Gen. Stat. § 14-51.1
 
 and enacted our current defensive force statutes,
 
 N.C. Gen. Stat. §§ 14-51.2
 
 , -51.3, and -51.4.
 
 See generally
 
 An Act To Provide When A Person May Use Defensive Force And To Amend Various Laws Regarding The Right To Own, Possess, Or Carry A Firearm In North Carolina,
 
 2011 N.C. Sess. Laws 268
 
 .
 

 Our amended "statutes provide two circumstances in which individuals are justified in using deadly force, thus excusing them from criminal culpability."
 
 State v. Lee
 
 ,
 
 370 N.C. 671
 
 , 674,
 
 811 S.E.2d 563
 
 , 566 (2018). Pursuant to
 
 N.C. Gen. Stat. § 14-51.3
 
 (a), "a person is justified in the use of deadly force and does not have a duty to retreat in any place he or she has the lawful right to be if either of the following applies": (1) the person "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another"; or (2) under the circumstances permitted by
 
 N.C. Gen. Stat. § 14-51.2
 
 .
 

 N.C. Gen. Stat. § 14-51.2
 
 , entitled "Home, workplace, and motor vehicle protection; presumption of fear of death or serious bodily harm," provides, in pertinent part:
 

 (a) The following definitions apply in this section:
 

 (1) Home.-A building or conveyance of any kind, to include its curtilage, whether the building or conveyance is temporary or permanent, mobile
 
 *286
 
 or immobile, which has a roof over it, including a tent, and is designed as a temporary or permanent residence.
 

 ...
 

 (b) The lawful occupant of a home, motor vehicle, or workplace is presumed to have held a reasonable fear of imminent death or serious bodily harm to himself or herself or another when using defensive force that is intended or likely to cause death or serious bodily harm to another if both of the following apply:
 

 (1) The person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a home, motor vehicle, or workplace, or if that person had removed or was attempting to remove another against that person's will from the home, motor vehicle, or workplace.
 

 (2) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.
 

 (c) The presumption set forth in subsection (b) of this section shall be rebuttable ....
 

 ...
 

 (d) A person who unlawfully and by force enters or attempts to enter a person's home, motor vehicle, or workplace is presumed to be doing so with the intent to commit an unlawful act involving force or violence.
 

 (e) A person who uses force as permitted by this section is justified in using such force and is immune from civil or criminal liability for the use of such force ....
 

 (f) A lawful occupant within his or her home, motor vehicle, or workplace does not have a duty to retreat from an intruder in the circumstances described in this section.
 

 (g) This section is not intended to repeal or limit any other defense that may exist under the common law.
 

 N.C. Gen. Stat. § 14-51.2
 
 .
 

 *287
 
 During the charge conference, defendant requested that the trial court provide
 
 N.C. Gen. Stat. § 14-51.2
 
 's corresponding pattern jury instruction, N.C.P.I.-Crim. 308.80 "Defense of Habitation-Homicide and Assault." The trial court, however, determined that defendant was not entitled to the requested instruction because there was no evidence that he "was trying to prevent an entry." According to the trial court, defendant's evidence demonstrated that he was attempting to prevent injury to himself, "not that he was trying to prevent somebody from coming into his curtilage or home."
 

 The trial court's ruling was in error. As explained in the "Note Well" preceding the pattern instruction, "[t]he use of force, including deadly force, is justified when the defendant is acting to prevent a forcible entry
 
 *832
 
 into the defendant's home, other place of residence, workplace, or motor vehicle,
 
 or to terminate an intruder's unlawful entry
 
 ." N.C.P.I.-Crim. 308.80 (emphasis added). This language accurately summarizes the presumption accorded to the lawful occupant of a home who utilizes deadly force to defend the habitation.
 
 N.C. Gen. Stat. § 14-51.2
 
 (b). Moreover, for purposes of the statute, "home" means "[a] building or conveyance of any kind,
 
 to include its curtilage
 
 , whether the building or conveyance is temporary or permanent,
 
 mobile or immobile
 
 , which has a roof over it, including a tent, and is designed as a temporary or permanent residence."
 
 N.C. Gen. Stat. § 14-51.2
 
 (a)(1) (emphases added).
 

 On appeal, the State concedes that Dockery was "standing beside the porch on the ground, within the curtilage" of defendant's property when defendant fired the fatal shot. However, the State contends that defendant was not entitled to the requested defense of habitation instruction, because Dockery "never came on Defendant's porch and never tried to open the door to Defendant's trailer." We disagree.
 

 The State's interpretation defies the plain language of the statute. "If the language of a statute is free from ambiguity and expresses a single, definite, and sensible meaning, judicial interpretation is unnecessary and the plain meaning of the statute controls."
 
 State v. Holloman
 
 ,
 
 369 N.C. 615
 
 , 628,
 
 799 S.E.2d 824
 
 , 832-33 (2017) (citation omitted). The language of
 
 N.C. Gen. Stat. § 14-51.2
 
 (b) is clear: the same rebuttable presumption of lawfulness applies if the person against whom defensive force is used "was in the process of unlawfully and forcefully entering,
 
 or had unlawfully and forcibly entered
 
 , a home," and the person using defensive force knew or had reason to believe that "an unlawful and forcible entry ... was occurring
 
 or had occurred
 
 ."
 
 N.C. Gen. Stat. § 14-51.2
 
 (b)(1)-(2) (emphases added).
 

 *288
 
 Viewed in the light most favorable to defendant, the evidence supports a jury instruction on the defense of habitation. Despite numerous requests to leave and multiple orders from law enforcement, Dockery continued to return to defendant's property while repeatedly threatening him with bodily harm. As the State acknowledges, it is undisputed that Dockery was within the curtilage of defendant's property-and therefore, within his home,
 
 N.C. Gen. Stat. § 14-51.2
 
 (a)(1) -when defendant utilized defensive force against him. Accordingly, we hold that the trial court erred by denying defendant's request for a jury instruction on the defense of habitation, N.C.P.I.-Crim. 308.80.
 

 Furthermore, defendant was prejudiced by the trial court's failure to provide the requested instruction, because a person who uses permissible defensive force pursuant to
 
 N.C. Gen. Stat. § 14-51.2
 
 "is justified in using such force and
 
 is immune from civil or criminal liability
 
 for the use of such force[.]"
 
 N.C. Gen. Stat. § 14-51.2
 
 (e) (emphasis added). Moreover, our Supreme Court has noted that a jury instruction on the common-law defense of habitation "would be more favorable to a defendant than would an instruction limited to self-defense."
 
 McCombs
 
 ,
 
 297 N.C. at 158
 
 ,
 
 253 S.E.2d at 911
 
 . This remains true pursuant to
 
 N.C. Gen. Stat. §§ 14-51.2
 
 and 14-51.3.
 
 See
 

 Lee
 
 , 370 N.C. at 674,
 
 811 S.E.2d at 566
 
 ("The relevant distinction between the two statutes is that a rebuttable presumption arises that the lawful occupant of a home, motor vehicle, or workplace reasonably fears imminent death or serious bodily harm when using deadly force at those locations under the circumstances in [N.C. Gen. Stat.] § 14-51.2(b). This presumption does not arise in [N.C. Gen. Stat.] § 14-51.3(a)(1).").
 

 III. Conclusion
 

 The trial court committed prejudicial error by failing to provide defendant's requested jury instruction on the defense of habitation, N.C.P.I.-Crim. 308.80. Therefore, we reverse the judgment entered upon the jury's verdict finding defendant guilty of voluntary manslaughter and remand for a new trial. Because we have reversed and remanded for a new trial, we need not address defendant's remaining arguments on appeal.
 

 NEW TRIAL.
 

 Judges DAVIS and TYSON concur.